Hugh Dale HOSKINS and Dorothy M.
Hoskins, Respondents,

v.

SHELBY COUNTY, Missouri, et
al., Appellants,

and

Valley Drainage District, a corporation,
et al., Respondents.

No. 59246.

Supreme Court of Missouri,
En Banc.

April 14, 1976.
Rehearing Denied May 5, 1976.

Dan Bollow, Bollow, Crist, Bollow & Wallace, Shelbina, for appellants.

Paul Brown and Patrick F. McLaughlin, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, for respondents.

MORGAN, Judge.

Shelby County (defendant-appellant) seeks reversal of a judgment which directs it to construct a new bridge across a drainage ditch located in said county. Having transferred the cause from the Court of Appeals on application of the county, we decide the same as on original appeal.

The suit was initiated against the county and the Valley Drainage District by the owners (plaintiffs-respondents) of approximately 723 acres of land situated along the south side of east-west County Road No. 152. The drainage ditch, now commonly referred to as Salt River, runs generally in a northerly and southerly direction (across No. 152) through said land and divides it into two near equal tracts.

Around 1914 a bridge (which, with approaches, was approximately 140 feet long) had been constructed across the new channel, presumably by the district. In 1970 the east approach became impassable and in 1973 the entire bridge "became so delapidated" that it fell to the bottom of the ditch. Between the latter two dates, plaintiffs had filed this action in two counts. The first sought a declaratory judgment as to which entity should replace the bridge; and, the second requested a mandatory injunction calling for that duty to be performed.

After trial, the court sustained the district's motion for dismissal and entered the judgment from which the county now appeals. It provides, in part:

> . . . that the defendant county court and the judges thereof, immediately and without delay, obtain from a competent engineer a determination and estimate of the cost of a sufficient crossing of the ditch, commonly called 'Salt River', at or immediately adjacent to county road 152, said crossing to be sufficient to carry highway traffic including farm machinery of the size, width and weight used in the general area of Shelby County, and immediately thereafter obligate the Road and Bridge Funds of Shelby County, and the credit of Shelby County, if that be-

comes necessary, and immediately and without delay contract, in accordance with law, for the construction of such crossing and thereafter maintain such crossing in accordance with law.

Prior to considering the reasoning of the trial court, we note those statutory provisions [1] upon which such rulings were made and the factual setting. They are, in part, as follows:

234.010—Each county court shall determine what bridges shall be built and maintained at the expense of the county . . .

242.350(3)—Any owner of land within or without the district may, at his own expense, and in compliance with the terms and provisions of section 242.010 to 242.-690, construct a bridge across any drain, ditch, canal or excavation in or out of said district.

242.350(4)—All drainage districts shall have full authority to construct and maintain any ditch or lateral provided in its plan for reclamation, across any of the public highways of this state, without proceedings for the condemnation of the same, or being liable for damages therefor. Within ten days after a dredge boat or any other excavating machine shall have completed a ditch across any public highway, a bridge adjudged sufficient by the county court of said county or counties shall be constructed over such drainage ditch where the same crosses such highway, and after such bridge has been constructed it shall become a part of the road over which it is constructed and *shall be maintained by the authority authorized by law to maintain the road of which it becomes a part.* (Emphasis added.)

242.350(5)—When any drainage district has heretofore constructed or shall hereafter construct a bridge over a drainage ditch where the same crosses any public highway, said drainage district shall not be under obligation thereafter to further maintain or reconstruct any such bridge or bridges for more than twenty years

after it first constructed or constructs such bridge at said place. If said bridge has been constructed by the drainage district and has become a part of said road and is then destroyed *the authorities having control of the road are authorized, if they desire, to reconstruct such bridge,* provided, however, the word corporation as used in this section shall not apply to the state or any political or civil subdivision thereof. (Emphasis added.)

Factually, the record reflects that No. 152 is a dirt road. At a point two and one-half miles east of the ditch, it connects with improved Route N; and, at a point three-fourths mile west of the ditch, it connects with improved Route MM. In the latter strip, the dirt road (No. 152) crosses a bridge (with a five-ton load limit) over some part of the original channel of Salt River. Plaintiffs are residents of Illinois and purchased the land in 1959. For some period of time it has been farmed by tenants. It seems agreed that prior to the collapse of the bridge, the county had kept that part of No. 152 (east of the ditch) in "excellent condition." Responsibility for that part west of the ditch was that of the Clarence Road District—not a party to this action. In 1967, however, said road district and the county jointly had put a new floor on the bridge with the apparent understanding that the county was responsible for the east one-half and the road district for that to the west. When the east approach started to give way, plaintiffs and some of their farm operators contacted the county court on several occasions. Estimates were made that at that time the east approach could have been repaired for eight to nine thousand dollars; but that it would now cost over sixty thousand to make a "new" crossing with a "used" bridge. It seems agreed that the county court did not declare that it would never take care of the problem, but all meetings ended with the court saying the money was not then available. One solution discussed was the giving of the old bridge to plaintiffs that they might make some sort of crossing. The

1. All statutory references being to RSMo 1969.

Presiding Judge of the county court testified that when he examined the east approach, he saw that the west abutment also was broken in two or three places; that there had been a lot of flood damage and "we didn't feel like we could do anything"; that a farmer to the north had dug a ditch on his land that directed "excessive water right into these approaches to the bridge"; that "it was a risky bridge in the condition it was before the east approach washed out"; that it was "used very little"; that "we felt the money should be spent on a more traveled road . . . where it would do more people good"; and, that "with the amount of damage we have this year on main and heavily traveled roads, I can't see where we can spend money on a dirt road that is traveled very little." One tenant testified that the land (both tracts) had been farmed since the bridge fell, but that "it wasn't the best conditions." He stated the bridge, before it fell, was too small for most equipment. His words were: ". . . the cultivator wouldn't fit unless you took it off. The planter wouldn't fit across it. One certain type of planter would, but not all planters would. And the combine wouldn't unless you had a real small head and most of ours was bigger * * * and the disk wouldn't and the mulcher wouldn't * * * You could load it and haul it across it though. You could load them on a trailer and go through sideways and they'd fit." Others agreed as to the "inconvenience" to plaintiffs, but that "it [the bridge] never had many come through." From a financial standpoint, plaintiffs offered testimony that they had one offer to purchase at a fair price from a prospect who backed out when he saw the bridge down; and the county established that it had other bridges down and that each year all revenue, plus some of that anticipated from the next year, was spent for roads and bridges. There are eleven bridges across Salt River in Shelby County and the trial court found that: "The average distance between crossings is approximately 2.4 miles to 5 miles and with the bridge at the locus out the distance between the nearest bridges up and down river is 6¼ miles."

We turn, again, to the judgment entered by the trial court.

■ *First,* it declared that the Valley Drainage District had no duty or liability by virtue of § 242.350(5) (as amended in 1949); because the bridge in question had been constructed more than twenty years before. That finding was correct. *Swisher Inv. Co. v. Brimson Drainage Dist.,* 362 Mo. 869, 245 S.W.2d 75 (1952).

*Second,* as heretofore noted, the county court was ordered to obligate the "credit" of the county and immediately construct a bridge "sufficient to carry highway traffic including farm machinery of the size, width and weight used in the general area." The ruling was predicated on the following approach to the problem which can be outlined and summarized as follows: (1) Plaintiffs had standing to file the suit by virtue of their suffering a unique and special injury not common to the community in general. *New v. South Daviess County Drainage Dist.,* 240 Mo.App. 807, 220 S.W.2d 79 (1949). (2) The county court abused the discretion granted in § 234.010, supra. (3) The duties of the county court are "specific and mandatory" under § 242.350(4) as to maintenance of the bridge since it became a "part of the road . . . and shall be maintained by the authority authorized by law to maintain the road . . ." (4) The county court, having failed that duty, must not only replace the entire bridge but must rebuild the same on a "larger" scale to accommodate the size of present day farming equipment. (5) The question presented has never reached the appellate courts, but it was recognized as a possibility in dicta found in *State ex rel. Bartle v. Coleman,* 33 Mo.App. 470 (1889), at l.c. 476, wherein the court said: "We need not decide whether or no, upon a proper case made, the discretion of the county court in failing to repair a public bridge might not be so unjust and oppressive as to call for its review by the courts having supervisory control."

The parties appreciate, as becomes obvious from a reading of the judgment en-

tered, that the trial court found the county court negligent in the performance of its duties and that the county must "respond" for its tortious conduct, i. e., replace the entire bridge (with wider specifications), including the one-half admittedly a responsibility of the Clarence Road District—which was not a party to the suit. Since the parties do not seek to rely on such an untenable analysis, we do not extend this opinion by doing so voluntarily. "The immunity from tort liability of the county as a subdivision of the state necessarily extends to the members of the county court when sued solely in their representative capacities." *Lloyd v. Garren*, 366 S.W.2d 341 (Mo. 1963). Compare *Jefferson County v. St. Louis County*, 113 Mo. 619, 21 S.W. 217 (1893).

For over fifty years, the courts of this state have been called on to place responsibility for bridges necessitated by the construction of drainage ditches through the swamp lands of this state.[2] A reading of the cases noted will reflect that initially the common law was followed, which called for one digging a ditch across a public road to provide a bridge; that after the Act of 1909, providing that "corporations" had to provide bridges, was construed in three cases by this court to include counties, the General Assembly in 1913 amended the Act to declare that a county was not a "corporation"; that, thereafter, by implication (drawn only from the 1913 amendment), the duty was placed on drainage districts, until the 1949 amendment which limited liability of a drainage district to the first twenty years after construction. Those interested may see an exhaustive analysis of such changes in *Swisher Inv. Co. v. Brimson Drainage Dist.*, 362 Mo. 869, 245 S.W.2d 75 (1952). In *State ex rel. McWilliams v. Little River Drainage Dist.*, 269 Mo. 444, 190 S.W. 897 (1916) this court said, at 902:

". . . it is regrettable that a studied effort seems to have been made to render this drainage statute vague and ambiguous upon the point where the burden of bridge building lies, . . ." "The vexatious vagueness of which the learned jurist there spoke is still as annoyingly persistent in the act of 1913 as before." *State ex rel. Ashby v. Medicine Creek Drainage Dist.*, 284 Mo. 636, 224 S.W. 343, 345 (1920). The vacuum exists yet today.

Must Shelby County replace the bridge under the provisions of § 242.350?

■ We think not. Subparagraph 4 of § 242.350 pertains to any bridge thereafter constructed over a drainage ditch, and it provides that "after such bridge has been constructed it shall become a part of the road over which it is constructed and shall be maintained by the authority authorized by law to maintain the road of which it becomes a part." This subparagraph is not limited to bridges constructed by a drainage district but would include also those constructed by a "corporation" as required in subparagraph 2 of § 242.350 or even by counties during those years prior to 1913 when the word "corporations" was construed to include counties. There is no limit provided as to the period of time the authority in charge of the road must "maintain" the bridge. Does that duty to "maintain" last forever? The judgment of the trial court assumes the answer is "yes" and is predicated necessarily on such a premise. The bridge in question is over sixty years old; and, if the absence of a statutory limitation for maintenance is considered as controlling, it would not be facetious to suggest the same duty to maintain would exist when the bridge is six hundred years old. We do not care to impute to the General Assembly an intent to create such an unreasonable result, but, to the contrary, believe that subparagraph 4 of § 242.350

**2.** Representative cases are: *State ex rel. Jones v. Chariton Drainage Dist. No. 1*, 252 Mo. 345, 158 S.W. 633 (1913); *State ex rel. McWilliams*, 269 Mo. 444, 190 S.W. 897 (1916); *State ex rel. Ashby v. Medicine Creek Drainage Dist.*, 284 Mo. 636, 224 S.W. 343 (1920); *State ex rel. Chamberlin v. Grand River Drainage Dist. of*  *Cass and Bates Counties*, 311 Mo. 309, 278 S.W.2d 388 (1925); *New v. South Daviess County Drainage Dist.*, 240 Mo.App. 807, 220 S.W.2d 79 (Mo.App.1949); and, *Swisher Inv. Co. v. Brimson Drainage Dist.*, 362 Mo. 869, 245 S.W.2d 75 (1952).

must be read in conjunction with § 234.010 which, generally, places discretion in the county court as to "what bridges shall be . . . maintained."

Perhaps in anticipation, plaintiffs contend that § 242.350 is *specific* and must take precedence over § 234.010 which is labeled *general*. The argument might be persuasive if § 242.350 was specific and answered the question, i. e., how long does the duty to maintain an aging bridge last? The weakness of plaintiffs' position may be shown by an example. Considered in *State ex rel. Curts v. Thomas*, 183 Mo. 220, 82 S.W. 106 (1904) were statutes *specifically* pertaining to building bridges across streams between counties. Grand River ran between the counties of Chariton and Carroll and the need for a bridge was evident. Chariton County made money available for its half of the project. Carroll County refused and suit was brought to mandamus compliance with § 5194, Mo.Rev. Statutes 1899, which dictated that: "When one moiety equal to one-half the expense of building such bridge, shall be raised by subscription, both county courts *shall forthwith* unite to cause such bridge to be built, and shall pay the residue of the expense of the bridge in the proportion herein before directed." (Emphasis added.) In denying relief, this court said, l.c. 108: "The law governing the building of public bridges is embodied in chapter 84, 2 Rev.St.1899, of which said sections 5193 and 5194 form a part; and, to properly understand those sections, they must be read in connection with the precedent sections of that chapter, by section 5182 of which it is provided that 'each county court shall determine what bridges shall be built and maintained at the expense of the county, * * *' and by section 5185 of which it is provided that 'if the county court be of the opinion that a bridge is necessary, and that it shall be built at the expense of the county, they shall determine in what manner and of what materials the same shall be built and the probable cost thereof. * * *' The provisions of the statute following, down to and including sections 5193 and 5194, prescribe in detail the manner in which the

power and discretion thus vested in the county court shall be exercised under different and variant circumstances, and, among these, under the circumstances set out in those two sections. But the law nowhere contemplates that any bridge shall be built at the expense of the county, in whole or in part, except such a bridge as the county court shall have determined to be necessary, in view of its locality, utility, cost, and the condition of the public fund that may be used for that purpose, considered in connection with other like claims upon such funds for like purposes. The discretion thus vested in the county court cannot be wrested from it or exercised by any other tribunal." A similar result may be found in *State ex rel. McMillan v. Woodside*, 254 Mo. 580, 163 S.W. 845 (1914). Furthermore, we think it only logical that when the amendment of 1949 removed drainage districts from the picture (after 20 years) the status of such bridges became as any other placed under the general supervision of the county court.

Subparagraph 5 of § 242.350 provides that if a bridge constructed by a drainage district over a drainage ditch (after 20 years) "is then destroyed" the authority having control of the road is authorized to reconstruct such bridge "if they desire." Plaintiffs seek to avoid the discretion thus placed by submitting that the bridge was not "destroyed" in the context the word is used in this subparagraph and that "the record is completely devoid of any evidence whatsoever as to what public or private person or corporation constructed said bridge." Although, in passing, we do consider if obvious from the record before us that the drainage district did build the now-fallen bridge and that the parties tried the case on that premise, we need not discuss it further in view of our disposition of the question reference our interpretation of subparagraph 4 of § 252.350.

*Did Shelby County abuse the discretion authorized by § 234.010?* We think not.

Since the caveat heretofore noted and found in *State ex rel. Bartle v. Coleman*, supra, this court in many cases has further

delineated the scope of the discretion reference bridges long placed with county courts. The answer has been so consistent that two further examples should suffice. In *State ex rel. Cameron Special Road Dist. of Clinton County v. Everett*, 245 Mo. 706, 150 S.W. 1054 (1912) the court said, l.c. 1057: "The *discretion* to expend the special road and bridge fund in the manner which will be most conducive to the general welfare of the inhabitants of the counties has been invested in county courts elected by the people; and it is a well-known rule of law that, where judicial officers possess discretion as to how their duty shall be performed, their discretion will not be interfered with by the writ of mandamus." Again, in *State ex rel. McMillan v. Woodside*, 254 Mo. 580, 163 S.W. 845 (1914) the court said, l.c. 848: "As to the matter of determining the necessity for a bridge, the guardians of the interest of the county are clothed with full powers of decision; for no bridge could be lawfully built at the expense of the county, unless the county court had first adjudged it to be necessary, and no superior judicial tribunal is authorized to restrain or coerce the county court in rendering its opinion on that particular matter, for to that extent its action is purely discretionary under the powers given to it by the language of the statute." See also: *Humphreys v. Dickerson*, 216 S.W.2d 427 (Mo. 1948); and, *State ex rel. Lane v. Panky*, 359 Mo. 118, 221 S.W.2d 195 (1949).

Regardless of the scope of discretion to be given the county in this instance, plaintiffs cannot prevail. The facts show that the county tax levies are at constitutional and statutory maximums; that all available funds plus some portion of each year's anticipated funds are being expended in the upkeep and repair of the many roads and bridges in the county; that the bridge in question would be a convenience to plaintiffs, but the evidence shows that there is no public necessity or even public utility involved; that there is a complete lack of any evidence that funds are being expended by the county other than for the best interest of the citizens of the county as a whole. Under such a state of facts, any decision as to what should be done in the premises should be made by those the citizens of this state have selected, i. e., the members of the county court; and, under the record presented there is nothing to indicate that said court acted in an "unjust" or "oppressive" manner.

The judgment is reversed.

All concur.